**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**

**CIVIL ACTION NO. 2:19-CV-69 (WOB)**

**CURT TOMLINSON**                                                           **PLAINTIFF**

**VS.**                              **MEMORANDUM OPINION AND ORDER**

**KRAUSS-MAFFEI CORPORATION**                                       **DEFENDANT**

In this case, Plaintiff Curt Tomlinson (Tomlinson) claims Defendant Krauss-Maffei Corporation (KMC) discriminated against him based on his having post-traumatic stress disorder (PTSD). Tomlinson asserts three claims under the Americans with Disabilities Act (ADA), including disability discrimination, failure to accommodate, and employer retaliation, as well as parallel claims under Kentucky antidiscrimination law, Ky. Rev. Stat. (KRS) § 344.040. Because Tomlinson resigned from KMC rather than being terminated, his discrimination claims are premised ultimately on a theory of constructive discharge.

KMC moved for summary judgment on all of Tomlinson's claims. (Doc. 46). The Court heard oral arguments on that motion on November 12, 2021 and took the matter under submission. After further review, the Court now issues the following Memorandum Opinion and Order.

1

## I.   BACKGROUND

KMC builds and services industrial machinery designed for the manufacture of plastics and rubber products. (*See* Doc. 46-1, KMC Mem. Supp. Mot. for Summ. J., at 2).   Between 2016 and 2018, Tomlinson worked for KMC as a Field Service Engineer (FSE). (Doc. 45-4, Employment Agreement; Doc. 45-19, Tomlinson Resignation Email, at 3).   Tomlinson suffers from PTSD, causing him to experience depression and anxiety. (Doc. 45, Tomlinson Dep. at 11:4-12, 14:18-22).   In short, Tomlinson accepted employment with KMC in June 2016, (Doc. 45-4), and was excused to take paid medical leave starting April 2018 per his physician's recommendation. (Doc. 45, Tomlinson Dep. at 158:23-61:18; Doc. 45-14 Physician's Excuse).   He subsequently resigned by email on August 27, 2018, (Doc. 45-19), having accepted a job with another company he had approached during his leave from KMC. (Doc. 45, Tomlinson Dep. at 53:5-54:22, 56:17-22).

As an FSE, Tomlinson performed repairs, provided maintenance, and rendered related services on machines for KMC's clients.   (*Id.* at 83:9-18).   Tomlinson reported directly to manager John Wiley for the entirety of his employment, as did the other FSEs at KMC. (*Id.* at 89:16-19).   Tomlinson received his service assignments more often and more directly from a service hotline coordinator, or "scheduler," Aeric Bouza. (Doc. 44, Wiley Dep. at 14:15-18).

During Tomlinson's active employment with KMC, i.e., while not on leave, three of KMC's clients complained of the quality of Tomlinson's service, and at least one requested Tomlinson not be sent back for future services. (*See* Doc. 43, Been-Skuban Dep. at 31:6–32:25; Doc. 44, Wiley Dep. at 59:14-19). Later, on March 14, 2018, Wiley sent Tomlinson an email containing a partly negative performance review for the year 2017. (Doc 45-12, 2017 Performance Evaluation). Straightforwardly, Wiley indicated certain areas of Tomlinson's job performance had to be addressed, and that Tomlinson still appeared to lack both a necessary problem-solving capacity and knowledge of KMC's product line, despite having already enjoyed additional training, shadowing, and a full year on the job. (*Id.*). While Tomlinson always demonstrated an apparent eagerness to learn and always had a good attitude, his inadequate product knowledge and troubleshooting ability were causes for concern. (*Id.*). Ultimately, the "Overall Rating" Wiley gave for Tomlinson's performance, per the evaluation form, was "Does not meet requirements." (*Id.* at 3). Still, Wiley merely recommended that an "action plan" be implemented to address these concerns. (*Id.*). Not only did Wiley not recommend termination or demotion, he awarded Tomlinson a 1% "Merit Increase" to his wage. (*Id.* at 4).

Tomlinson testified he was not previously aware of the negative client feedback, and that this unexpected criticism "really set off" his PTSD. (Doc 45, Tomlinson Dep. at 113:6). He

claims this interaction with Wiley, between the email, the evaluation report, and a follow-up phone call, was so "threatening and negative" as to severely aggravate his PTSD-related anxiety and depression. (Doc. 50 at 1). Tomlinson took Wiley's performance evaluation as targeted, discriminatory harassment for his having PTSD, both in its negative content and allegedly abusive delivery. (Doc. 1, Compl. at 2).

For context, however, when Tomlinson received his 2017 evaluation, he had only previously disclosed his PTSD via email to Randy Hemmerle in Human Resources for an unrelated allegation of harassment and bullying by another coworker. (Doc. 45-7, Hemmerle Email, Feb. 17, 2017). Wiley himself testified that he had not become aware of Tomlinson's PTSD until he saw it mentioned in an email later that year in July or August of 2018. (Doc. 44, Wiley Dep. at 71:11-18).

Tomlinson first took his complaints regarding Wiley's evaluation to Hemmerle, to which Hemmerle recommended Tomlinson simply talk to Wiley about the evaluation to reach a better understanding. (Doc. 45, at 176). The two talked by phone, but Wiley maintained that the customer complaints raised legitimate concerns about Tomlinson's service quality. (*See id.*). Wiley did not swear at Tomlinson or threaten Tomlinson's compensation or employment. (*Id.*). Notably, although Tomlinson maintained later in deposition that he felt Wiley was aggressive and demeaning, he

4

could not say even in hindsight why or how he thought Wiley "targeted" him because of his PTSD, especially when Hemmerle was the only person at KMC that could have been aware of his condition. (*Id.* at 147).

Dissatisfied, Tomlinson next complained to KMC's general counsel, Jenny Beene-Skuban, stating in an email on March 22, 2018, only: "I notified [Hemmerle] but I am bringing this up to you.  I got a review from John Wiley that I feel in his comments is threatening, harassing and is an attack on my PTSD." (Doc. 45-13). In response, Beene-Skuban expressed regret for Tomlinson's stated experience, asking what it was Wiley wrote or said that made him feel that way. (*Id.*).  Tomlinson never responded to this email. (*Id.*).  Instead, two weeks later on April 4, 2018, he emailed another employee working under Beene-Skuban, merely restating his original complaint. (*Id.*) This employee then forwarded the email to Beene-Skuban, who again expressed a willingness to learn more about the nature and background of Tomlinson's complaint. (*Id.*). Again, Tomlinson did not respond.

By the end of April 2018, Tomlinson took short-term disability leave.  While on leave on May 18, 2018, Tomlinson emailed KMC president Paul Caprio expressing disappointment for what he perceived to be apathy and disrespect toward his complaints, adding that he expected Beene-Skuban and others to do more. (*See* Doc. 46-2, Caprio Email).  Even at this point, Tomlinson still

5

had not requested any specific accommodation, failing to do so again in this May 18 email. (*See id.*).  Caprio forwarded the email to Hemmerle who then tried to call Tomlinson, leaving a voicemail welcoming discussion of this fourth complaint. (Doc 44, Wiley Dep. at 70:6-71:17; Doc. 46-2).  Hemmerle followed up the call attempt with an email welcoming discussion. (Doc. 45-15).  Tomlinson responded three days later, stating simply that he missed the call and required advance notice of calls, but said nothing more. (*Id.*).  In explaining why he was so hard to reach, Tomlinson stated that he was "having a hard time wanting to call and talk about [sic] when I don't feel my condition is taken seriously." (*Id.; see also* Doc. 45, Tomlinson Dep. at 176-77).  Hemmerle and Beene-Skuban continued to express an apparent willingness to discuss his issues and to cooperate with him in the matter. (*E.g.*, Docs. 45-13, 45-15).  Between Hemmerle and Beene-Skuban, there had been several unsuccessful attempts to reach Tomlinson by phone and email, and sometimes days or weeks would pass without response from Tomlinson. (*See, e.g.*, Doc. 45-13 at 2).  This was now a pattern.

KMC proceeded to conduct an internal review of Tomlinson's allegations, from which it ultimately concluded Wiley had not discriminated against or acted inappropriately towards Tomlinson, at least given the limited information Tomlinson had provided thus far. (Doc. 45-18).  Hemmerle emailed Tomlinson on June 21, 2018, with Beene-Skuban carbon-copied, stating the investigation

revealed Wiley simply delivered an appropriate, non-threatening professional assessment of Tomlinson's job performance. (*Id.*). Hemmerle and Beene-Skuban found no discriminatory intent, so no further action would be taken. (*See id.*).

Almost a month later on July 17, 2018, Tomlinson finally requested a specific accommodation by email, asking that KMC make Aeric Bouza his supervisor instead of Wiley. This is the only accommodation Tomlinson specifically requested for his PTSD. (*See* Doc. 45, Tomlinson Dep. at 221:22–222:2). Tomlinson felt Bouza would "deal with [his] employees better than John Wiley d[id]," that "at least [Tomlinson] would work for somebody that wasn't being abusive." (*Id.* at 222:9-14).

As mentioned, however, Bouza was a service coordinator and hotline operator, not a manager like Wiley. (*Id.* at 222:6-9). Both Bouza and Tomlinson reported up a chain of command directly to Wiley. (*Id.* at 222:15-19). Bouza was Tomlinson's coworker, not his supervisor. (*Id.*).

Meanwhile, Tomlinson continued to take leave per his physicians' recommendations, and KMC continued paying him short-term disability compensation until he resigned unexpectedly via email for another job on August 27, 2018. (*See* Doc. 45-14; Doc. 45-19). KMC never made Bouza a supervisor to Tomlinson.

KMC's motion for summary judgment addresses two main issues: (1) Whether Tomlinson's PTSD is a protected "disability" under the

7

ADA, and (2) whether any of KMC's actions or omissions constituted actionable adverse employment actions or, alternatively, whether such actions or omissions culminated in unlawful constructive discharge. Each of these issues are settled separately under the standard of law set forth under Federal Rule of Civil Procedure 56.

## II.   STANDARD OF LAW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the Court views all material facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Lanman v. Hinson*, 529 F.3d 673, 679 (6th Cir. 2008).

"Where, as here, the plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, we require the plaintiff to establish a prima facie case, followed by the familiar *McDonnell Douglas* burden-shifting." *Burdett-Foster v. Blue Cross Blue Shield of Michigan*, 574 F. App'x 672, 679-80 (6th Cir. 2014) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)). Only if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a prima facie violation may we find for the

movant. *Cf. Lanham,* at 679 (quoting *Berryman v. Rieger,* 150 F.3d 561, 563 (6th Cir. 1998)).

### III.   ANALYSIS

Tomlinson must first demonstrate his PTSD is a protected disability under the ADA.  Then, if he does so, he must show a genuine dispute of fact exists as to whether he suffered discrete adverse employment actions, a failure to accommodate or engage in the interactive process, unlawful retaliation, or that any of these circumstances rose to the level of constructive discharge.

Though the Court assumes in the following analysis that his PTSD is a protected disability, it concludes no reasonable person could find Tomlinson faced any form of invidious disability discrimination, failure to accommodate, retaliation, or constructive discharge.  For the following reasons, but primarily because Tomlinson suffered no adverse employment action for purposes of the ADA, the Court grants KMC's motion for summary judgment.

### A. Tomlinson's PTSD as a Disability

Tomlinson argues that his PTSD qualifies as a protected disability under the ADA because it interferes with several statutorily recognized "major life activities," his work in particular, but also his sleep, communication, and concentration. KMC argues that Tomlinson's PTSD is not a disability under the ADA, and that at most his psychological issues are attributable to

9

personality conflicts with certain people at KMC, particularly with his supervisor, John Wiley.

Whether Tomlinson's PTSD constitutes a "disability" under the ADA, specifically 42 U.S.C. § 12102(1), is a threshold matter on which he must prevail to even assert his various claims at all. Under Section 12102(1), "disability" means an individual "(A) [has] a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) [has] record of such an impairment; or (C) [is] regarded as having such an impairment. . . ." "Major life activities" includes work, concentrating, communicating, and sleeping, *see* 42 U.S.C. § 12102(2), all of which Tomlinson claims his PTSD impairs. (Doc. 50 at 15).

Whether a person has a disability is an individualized inquiry. *Lane v. Bell Cty. Bd. of Educ.*, 72 F. App'x 389, 395 (6th Cir. 2003).[1]  PTSD *can* be a disability under the ADA, but is not always.  For example, the Sixth Circuit held in *Tinsley v. Caterpillar Fin. Servs., Corp.*, that the plaintiff's claimed PTSD had to limit her ability to work in a sufficiently broad and significant way to qualify as a disability under the ADA.  766 F. App'x 337, 342 (6th Cir. 2019).

---

[1] *See also* 29 C.F.R. § 1630.2(j)(1)(iv) ("The determination of whether an impairment substantially limits a major life activity requires an individualized assessment.").

The *Tinsley* court explained that to be substantially limited from working so as to be "disabled," "an individual must be significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Id.* 342 (citing *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 317 (6th Cir. 2001)). Even where the plaintiff's PTSD may have severely impeded her ability to work for the defendant, her condition did not qualify as a disability under the ADA where her issues, i.e., her alleged symptoms, stemmed from working under a specific supervisor with a specific defendant-employer. *Id.* at 341-343 ("Although [plaintiff] has a disability—PTSD—she has not demonstrated that her disability 'substantially limits' her from 'work,' as that term is understood vis-à-vis the ADA.") (quotations omitted).

Keeping in mind *Tinsley*'s somewhat higher standard as to the requisite "limitation" on "work," this Court finds relatively strong record evidence that Tomlinson's PTSD constitutes a "disability" under the ADA. According to his doctors, Tomlinson's PTSD interfered not only with his immediate role at KMC, it more deeply and comprehensively hampered his life and ability to work in general. A broader disability is evident from Tomlinson qualifying for FMLA leave, supported further by doctors' notes recommending Tomlinson's extended period of leave for PTSD-related

11

anxiety and depression, symptoms apparently so severe he could not be expected to do *any* work while his symptoms persisted.

This evidence distinguishes the immediate case from *Tinsley* in at least two material respects. First, although defendants argue so, the evidence in the record does not conclusively link Tomlinson's anxiety and depression specifically to Wiley or others at KMC. Indeed, KMC is correct that "[p]ersonality conflicts, workplace stress, and being unable to work with a particular person or persons do not rise to the level of a 'disability' or inability to work for purposes of the ADA." *Burdett-Foster*, 574 F. App'x at 680 (citing *Fricke v. E.I. Dupont Co.*, 219 F. App'x 384, 389 (6th Cir. 2007)). This principle was more or less recognized by the panel in *Tinsley*. But in that case, the plaintiff's own doctor apparently regarded her PTSD symptoms as more attributable to a particular supervisor's management style as opposed to a general symptomatic interference with her ability to do work at all, leading her physician to suggest the plaintiff could likely return to work in the same position for the defendant-employer provided she was able to work under a different supervisor.

In this case, the particular source of Tomlinson's anxiety and depression is disputed and appears to manifest as a more generalized disorder. Although Tomlinson points to the negative evaluation as a strong triggering event, the source of his condition is not conclusively particularized to Wiley. Nor is

work the only life activity with which he claims his PTSD interferes, because he also experiences trouble sleeping, concentrating, and communicating.  Second, and also dissimilar to *Tinsley*, Tomlinson's doctors continued to recommend he take leave from work.  This indicates, at least as this Court views the medical evidence most favorably to Tomlinson, that Tomlinson suffers from a more generalized condition that the panel required of the plaintiff in *Tinsley*.

Considering these facts in a light most favorable to Tomlinson, Tomlinson's PTSD, as a general psychological affliction, "substantially limited," i.e., it "significantly restricted," Tomlinson's ability to work.  As work is a major life activity under 42 U.S.C. § 12102(2)(A), the Court assumes for purposes of this motion that Tomlinson is disabled under the ADA.

**B. Discrimination under the ADA**

Having determined Tomlinson's PTSD is a disability under the ADA, the issue remains whether any action or inaction of KMC can reasonably support Tomlinson's disability-discrimination claims, particularly to any extent they may have contributed to Tomlinson's alleged constructive discharge.

Tomlinson claims John Wiley's performance review was an actionable adverse employment action and KMC's refusal to remedy the situation as he requested created work conditions that forced his resignation.  KMC counterargues that Wiley's performance

13

review was not an adverse employment action given the applicable Sixth Circuit precedent, and that even if it were, it was not so severe as to meet the high bar for constructive discharge, especially given KMC's clear attempts to rectify any possible discrimination Tomlinson may have experienced. Sixth Circuit precedent and the record evidence can only be reasonably interpreted to support KMC's motion.

Even assuming Tomlinson has a qualifying disability, he must prove an adverse employment action, whether the discriminatory act is framed as a discrete action or omission, or the element is satisfied by evidence of pattern of employer conduct causing constructive discharge. *See* 42 U.S.C.A. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.").

For clarity, Tomlinson conceptualizes Wiley's performance review as a discrete act of discrimination, as an adverse employment action exacerbating the symptoms of his disability. Tomlinson further claims Wiley's supervision was an intolerable work condition that KMC refused to rectify by appointing a coworker as his new supervisor, forcing Tomlinson to resign in constructive

discharge.  Tomlinson's multiple claims fail for several reasons unequivocally supported both by case law and record evidence.

### 1. Disability Discrimination

To establish a prima facie disability-discrimination claim under the ADA, Tomlinson must prove: (1) he was disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) the employer knew or had reason to know the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (internal quotation omitted).

Tomlinson's prima facie claim clearly fails on the last three elements.  Tomlinson has presented no evidence that KMC or any of its employees took any "adverse employment action" against him as that term is understood vis-à-vis the ADA, that is, a materially adverse change in the terms or conditions of employment because of the employer's conduct. *See Talley*, 52 F.3d at 1107 (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)). In general, a "negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 322 (6th Cir. 2007).

Here, Wiley's performance evaluation actually prescribed a modest raise, ande nothing in the way of demotion or discipline. Other than a raise, no other condition of Tomlinson's employment changed for better or worse as result of his evaluation. The evaluation itself was thus not an adverse employment action.

Furthermore, there is evidence affirmatively showing Wiley's performance review was objectively true, namely that three customers had complained about Tomlinson's service quality, and one had even asked Tomlinson not to be sent back for future service. The objectivity of Wiley's review demonstrates a clear lack of discriminatory intent.[2]

Ultimately, then, Tomlinson's position that the evaluation was discriminatory can lie only in the purportedly "aggressive, threatening" tone it was delivered. (Doc. 45, at 149:1-19 ("I just felt like he just was ... doing anything he could to ... belittle me and just threat[en] or harass me.")). Tomlinson admits Wiley did not swear at him, nor could he give any concrete example of how he was berated or threatened. It appears from Tomlinson's own version of events that Wiley simply refused to cede ground on what his evaluation concluded, but that he maintained a frank but

---

[2] In fact, the record indicates, and Tomlinson acknowledged, that two other FSEs were similarly recommended for "performance improvement plans," but there is no suggestion either of those employees were so recommended on the basis of disability status or as members of a protected class. (Doc. 45, at 211:5-18). In fact, unlike these two employees who were place on "Performance Improvement Plans," Tomlinson was not. (*Id.* at 211:1-212:8).

professional composure towards Tomlinson.  Wiley's criticism and subsequent lack of concession offended Tomlinson, but nothing Tomlinson could specifically identify about his interaction with Wiley can be reasonably construed as discriminatory, especially given all the evidence that Wiley was totally unaware of Tomlinson's PTSD.

Neither the review nor the manner in which it was delivered can be reasonably construed as discrimination against Tomlinson. The only reasonable conclusion to draw from the record is that Tomlinson took Wiley's frank criticisms as a personal attack.  But even if Tomlinson's PTSD caused a particularly strong emotional reaction to Wiley, there is insufficient evidence to prove Wiley was picking Tomlinson out and discriminating against him on the basis of his PTSD.  Therefore, Wiley's performance evaluation is not independently actionable, nor can it contribute to Tomlinson's alleged constructive discharge.

### 2. Failure to Accommodate

Even if Wiley's review were a distinct act of discrimination as Tomlinson alleges, and it is not, he cannot say KMC failed to reasonably accommodate his condition with respect to working with Wiley.  Tomlinson claims he requested a reasonable accommodation in asking KMC to make Aeric Bouza Tomlinson's supervisor in Wiley's stead.  KMC argues its refusal to make Bouza, a non-supervisory coworker, Tomlinson's direct supervisor instead of Wiley was not

17

a reasonable accommodation under controlling precedent.  The Court agrees with KMC.

A prima facie accommodation claim would require Tomlinson to show (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know about his disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Keogh v. Concentra Health Servs., Inc.*, 752 F. App'x 316, 326 (6th Cir. 2018) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)).

As part of satisfying the last prong, ADA regulations require an employer to initiate "an informal interactive process" when necessary to determine how an employee's disability limits his ability to work and to identify appropriate reasonable accommodations. *See Arndt v. Ford Motor Co.*, 716 F. App'x 519, 528 (6th Cir. 2017) (quoting *Williams v. AT&T Mobility Servs.* LLC, 847, F.3d 384, 395 (6th Cir. 2017); 29 C.F.R. § 1630.2(o)(3)) (quotations omitted).  This interactive process is mandatory, and *both* parties must participate. *Id.*  When either party fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility accordingly. *Id.* (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)).

For this part of the analysis, too, it may again be granted that Tomlinson's PTSD is a disability under the ADA; that, despite room to improve, he was sufficiently qualified for the job with or without accommodation;[3] and that KMC was aware of Tomlinson's PTSD by the time he specifically asked for the relevant accommodation.[4] Tomlinson thus satisfies the first three elements of the prima facie accommodation claim.  However, Tomlinson's accommodation claim fails because Tomlinson did not adequately engage in the interactive process, making no specific accommodation request until months after he claims to have needed accommodation.  It then fails as for his last month of employment, too, for although he eventually made a specific request for accommodation, a change in supervisor, this accommodation was not "reasonable" under Sixth Circuit precedent.  Each of these points is discussed in turn.

"An ADA plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Talley*, 542 F.3d at 1108 (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007)). *See also Stanciel v. Donahoe*, 570 F. App'x 578, 583 (6th Cir. 2014) (quoting

---

[3] By 2017, KMC's apparent intention to keep Tomlinson on, and the language of the performance evaluation stating a plan of action for employee development rather than discipline or demotion for the job, both indicate KMC considered Tomlinson sufficiently qualified, all the way until his resignation. Additionally, Wiley's deposition testimony reveals that earlier in 2016 he regarded Tomlinson as both qualified and a good fit for the company. (*See* Doc. 44, Wiley Dep. at 18:22-19:7).

[4] Hemmerle, Beene-Skuban, and Caprio were all aware of Tomlinson's PTSD by the time Tomlinson specifically requested an accommodation in July 2018.

19

*Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 n.4 (6th Cir. 1998) ("[It is the] sensible policy that the employer not [be] required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation.") (quotations omitted with minor paraphrasing); *Deister v. Auto Club Ins. Ass'n*, 647 F. App'x 652, 658 (6th Cir. 2016) (citing *Stanciel*, at 583) ("[I]n requesting an accommodation, we require plaintiffs not only to request to be accommodated, but to also provide their employers with a sufficient basis to understand that the request is being made because of their disability.") (quotations omitted).

Tomlinson's request for accommodation was made late in this series of events, on July 17, 2018, *months* after he had taken leave for his PTSD, and just over a month before he resigned from KMC entirely. KMC had responded and contacted Tomlinson multiple times, by multiple mediums, inviting him to describe his situation and to suggest a solution. Tomlinson failed to reciprocate in any constructive or meaningful way, failing repeatedly to respond directly to KMC's several prompts for discussion until July 17, 2018. Until then, Tomlinson's needs had remained either completely vague or unarticulated despite KMC's multiple attempts to elicit a productive response. Tomlinson's multiple emails to various persons in the KMC chain of command were merely complaints and assertions that he was not being taken seriously. They were not true requests for accommodation, having specified no accommodation

until July 2018. Thus, because Tomlinson failed to meaningfully engage in the interactive process with KMC, the Court holds Tomlinson cannot plausibly claim KMC failed to accommodate his disability at any time before July 17, 2018.

Further, the ADA requires only that employers make "*reasonable* accommodations." *See* 42 U.S.C. § 12112(b)(5)(A) (emphasis added). The requested accommodation, a change of supervisor, is generally not considered "reasonable" for purposes of an accommodation claim. *Deister*, at 658 n.2 (6th Cir. 2016). Thus, KMC was not obliged to honor accommodate Tomlinson by assigning a coworker to supervise him. *See id.*

There is no reasonable inference to be drawn from the record evidence that KMC failed to engage in the interactive process with Tomlinson in good faith. *See Arndt v. Ford Motor Co.*, 716 Fed. App'x 519, 528 (6th Cir. 2017). And because Tomlinson made no request for *reasonable* accommodation, KMC's refusal cannot furnish a basis for Tomlinson's accommodation claim under the ADA, and the failure to accommodate cannot be considered a contributing factor to the alleged constructive discharge.

### 3. Retaliation

A retaliation claim under the ADA vindicates an employee's right to oppose what he reasonably believes to be unlawful discrimination. *See Sharp v. Waste Mgmt., Inc.*, 47 F. Supp. 3d 584, 601 (S.D. Ohio 2014), *aff'd sub nom. Sharp v. Profitt*, 674 F.

App'x 440 (6th Cir. 2016).  Prima facie retaliation has four elements: (1) the plaintiff engaged in legally protected activity under the ADA; (2) the defendant knew of the plaintiff's exercise of that right; (3) the defendant took adverse employment action against the plaintiff; and (4) the protected activity and the employment action are causally connected to the exercise of protected rights.  *Id.* at 600 (citing *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).  If the plaintiff establishes a prima facie retaliation claim along with the requisite causation, the burden then shifts to the defendant to prove a legitimate, non-discriminatory and non-retaliatory reason for the adverse employment action. *Skelton v. Sara Lee Corp.*, 249 F. App'x 450, 457 (6th Cir. 2007).  If the defendant succeeds, the burden shifts back to the plaintiff to prove the defendant's reason is pretextual. *Id.*

Here, Tomlinson's protected activity was notifying KMC of his disability and asking for an accommodation.  But even if we assume all individuals involved at KMC were by then aware of this request, it has already been determined that no one at KMC took adverse employment action against Tomlinson.  There is no other retaliatory action he can identify evident from the record.  Thus, this claim quickly fails on the third prong and, of course, cannot contribute to his constructive discharge theory.

4. *Constructive discharge.*

Constructive discharge can satisfy the adverse action element of a prima facie discrimination claim. *See Saroli v. Automation & Modular Components, Inc.*, 405 F.3d 446, 451 (6th Cir. 2005). "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014)). To survive this motion for summary judgment, Tomlinson must show there are genuine disputes of material fact that (1) KMC deliberately created intolerable working conditions, as perceived by a reasonable person, (2) with the intention of forcing Tomlinson to resign. *See id.* (citing *Laster*, at 727-28).

The first element requires the court to determine whether KMC caused intolerable employment conditions for Tomlinson. As explained above, there is no reason to think that Wiley's performance evaluation made Tomlinson's work at KMC "intolerable," even if Tomlinson felt hurt by the negative feedback. Tomlinson still claims KMC's alleged failure to accommodate his PTSD made work for KMC intolerable.

The Sixth Circuit has held "a *complete* failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge."

23

*Hurtt v. Int'l Servs.*, 627 Fed. App'x 414, (6th Cir. 2015) (emphasis added) (quoting *Talley*, 542 F.3d at 1109). But for many of the reasons the Court stated above as to Tomlinson's accommodation claim, KMC did not fail to accommodate because they made repeated reasonable efforts to address his PTSD-related concerns and Tomlinson's requested accommodation was not reasonable under the ADA. Between Wiley's negative review and KMC's evident willingness to investigate and rectify any discrimination in the company, nothing suggests any condition at KMC would be intolerable to a reasonable person.

Tomlinson's allegation of constructive discharge can be disposed of on the intent element as well. There is no evidence any person at KMC harbored or acted with discriminatory intent towards Tomlinson. Wiley could not possibly have rendered a negative performance evaluation on account of Tomlinson's PTSD because Wiley was not aware of Tomlinson's condition until months after he had already made and delivered the evaluation. Tomlinson had only prior disclosed his PTSD to Hemmerle in Human Resources. Only after receiving the evaluation did Tomlinson next disclose his condition to KMC general counsel Beene-Skuban and KMC president Caprio. Thereafter, no one at KMC evinced anything other than a willingness to support and accommodate Tomlinson, even after KMC had already found Wiley's evaluation was fair and objective and that it was delivered in a professional manner. (Doc. 45-16, Email

from Beene-Skuban (dated July 23, 2018) (offering, even after KMC's determination of no-discrimination, to arrange a meeting with Wiley and Hemmerle to resolve any remaining personal issues); Doc. 45-17, Email from KMC President Caprio (dated July 30, 2018)("... I would like for you to come back to work when you are ready and we are very supportive of all our employees with any issues....")).

There is nothing in the record upon which a factfinder could reasonably infer an intent to make Tomlinson's working conditions intolerable in an effort to force him to resign. Tomlinson was not constructively discharged. Tomlinson's Kentucky claims are similarly without merit.

### 5. Kentucky Claims

For the same reasons the Court grants KMC's motion for summary judgment as to Tomlinson's federal claims under the ADA, it grants the motion as to his state claims under the Kentucky Civil Rights Act, the interpretation of which is informed by the same federal law and principles. *See Charalambakis v. Asbury University*, 488 S.W.3d 568, 575 (Ky. 2016).

### IV.   CONCLUSION

Tomlinson has failed to produce evidence to support a genuine dispute as to the prima facie elements of his claims under the ADA or KCRA, and his constructive discharge claim is without merit. Accordingly, it is **ORDERED** that Krauss-Maffei Corporation's motion

for summary judgment (Doc. 46) is **GRANTED** as to all of Tomlinson's claims.  A separate judgment shall enter concurrently herewith.

This 8th day of December, 2021.



Signed By:

**William O. Bertelsman**

**United States District Judge**